IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br>vs.<br><br>MARK STEELE,<br><br>     Defendant. | 8:17CR113<br><br>**FINDINGS AND<br>RECOMMENDATION** |

   This matter is before the Court on the Motion to Suppress (Filing No. 16) filed by Defendant, Mark Steele. Defendant filed a supporting brief (Filing No. 17) and the government filed a brief in opposition (Filing No. 37). The Court held an evidentiary hearing on the motion on August 8, 2017. Defendant was present with his attorney, William Gallup. The government was represented by Assistant United States Attorney, Thomas Kangior.

   Sergeant Jason Mayo ("Sgt. Mayo") of the Lancaster County Sheriff's Office testified for the government. The Court received into evidence, without objection, an audio/visual recording of the traffic stop at issue (Exhibit 1). The Court also took judicial notice of Nebraska Revised Statute § 60-6,140(1) as requested by the government, without objection. A transcript (TR.) of the hearing was filed on August 18, 2017. (Filing No. 44). The matter is now fully submitted to the Court. For the following reasons, the undersigned magistrate judge recommends that Defendant's motion be granted.

## BACKGROUND

   On February 10, 2017, at approximately 9:30 a.m., Sgt. Mayo observed a white Dodge pickup truck bearing Wyoming license plates traveling westbound on Interstate 80. (TR. 11-12, 20). Sgt. Mayo testified the pickup appeared to be following another vehicle too closely for the pickup's speed of approximately sixty-five to seventy miles per hour. (TR. 13). Sgt. Mayo used a digital stopwatch and clocked the pickup traveling 0.51 seconds behind another vehicle. (TR. 14). Sgt. Mayo, who has worked full-time in traffic enforcement on Interstate 80 for four and a half years, testified that "[u]nder three seconds is the standard for the nation" and was familiar with accidents caused by vehicles following within two seconds of another vehicle. (TR. 10, 13, 15). Sgt. Mayo initiated a traffic stop of the pickup by activating his overhead emergency lights.

(TR. 16). The pickup, driven by Defendant, turned on his right turn signal and pulled over to the right shoulder of the interstate. (TR. 16; Ex. 1 at 2:17).

After making the stop, Sgt. Mayo approached Defendant's vehicle on the passenger side. Sgt. Mayo explained to Defendant the reason for the stop and expressed his intention to issue a warning. (TR. 17). Sgt. Mayo testified that he was suspicious of Defendant's demeanor due to Defendant's nervousness, diverted attention (because Defendant left his turn signal on), and reluctance to access the glove box or center counsel to retrieve proof of insurance for the vehicle. (TR. 16-18). Sgt. Mayo testified the pickup had a "lived-in look" due to loose trash and a box of 5-hour energy drinks, and noticed there were only two backpacks in the pickup, which Sgt. Mayo did not think was much luggage for an extended trip. (TR. 19). Sgt. Mayo asked Defendant to come back to the police vehicle while he filled out the warning, which he does every stop. (TR. 18; Ex. 1 at 4:07-14). After Sgt. Mayo indicated to Defendant that it was safe, Defendant exited his vehicle to sit in Sgt. Mayo's cruiser. (Ex. 1 at 5:12-5:50).

Sgt. Mayo began writing a warning citation and asking Defendant questions. (TR. 18; Ex. 1 at 5:57). Sgt. Mayo testified that his general procedure when he conducts a traffic stop is to run the person's driver's license and vehicle registration through his cruiser's mobile data terminal, while he fills out a warning citation. (TR. 18-19). These tasks usually take a minimum of ten minutes. (TR. 19). Sgt. Mayo looked through the pickup's registration paperwork and ran Defendant's driver's license, which were satisfactory. (TR. 18, 35). Sgt. Mayo testified that as he fills out a warning, he also runs an "NCIC" or "III" to get a criminal history and check for "wants and warrants," and also calls for an El Paso Intelligence Center ("EPIC") check. (TR. 19, 81). The NCIC and EPIC checks are run through a dispatcher by telephone. (TR. 81-83).

After Defendant got into Sgt. Mayo's vehicle, Sgt. Mayo began asking a number of questions about Defendant's residence, employment, and travels. (TR. 20). Defendant told Sgt. Mayo he used to live in California near Mammoth, but had moved to Wyoming close to Salt Lake City, Utah, about three years before. (Ex. 1 at 5:57-6:49). Defendant told Sgt. Mayo he had two weeks of vacation, so he left his wife at home and went on a photo tour around Indiana and Tennessee, and was on his way home. (Ex. 1 at 7:01-31).[1] Sgt. Mayo testified that he did not see camera equipment in Defendant's pickup. (TR. 20). Defendant stated he works as a civil

---

[1] Sgt. Mayo testified Defendant said this with a "weird southern drawl." (TR. 68). After careful review of Exhibit 1, the undersigned magistrate judge did not hear Defendant speak with a southern drawl at any point during this conversation.

2

designer designing waste water treatment plants for the City of San Gabriel in Los Angeles, California.  (Ex. 1 at 7:37-53).  Defendant also stated his job entails GIS mapping, which requires measuring manholes and storm water drains for the City of San Gabriel; he described himself as a "technical nerd."  (Ex. 1 at 7:54-8:17).

Defendant was wearing an Oakland Raiders t-shirt, so Sgt. Mayo engaged Defendant in conversation about the Raiders and other football teams.  (Ex. 1 at 8:21-52).  Sgt. Mayo testified the fact that Defendant was wearing an Oakland Raiders t-shirt was "important" and "suspicious" because California is a drug source state, and because Sgt. Mayo thought Defendant might not be truthful about living in Wyoming.  (TR. 51-52, 58-59).[2]

Defendant commented that he "never had to sit in a police car before."  (Ex. 1 at 8:52-57).  Sgt. Mayo explained he was writing Defendant a warning and it was easier to have Defendant in his cruiser to ask questions instead of having to go back and forth between cars.  (Ex. 1 at 8:58-9:13).  Sgt. Mayo testified that he believed Defendant's demeanor throughout Sgt. Mayo's questioning was "odd" because Defendant would "stop and pause, as if he's thinking about his answers" and would "stop and scratch his head," which indicates nervousness.  (TR. 21).  Sgt. Mayo testified that unlike Defendant, the typical motorist's nervousness usually subsides after learning he or she is only getting a warning, and Defendant's behavior, mannerisms, and responses to questions was consistent with people who are involved in some sort of criminal activity.  (TR. 24).

Sgt. Mayo and Defendant discussed how busy the highway looked and Sgt. Mayo talked about traffic problems on Interstate 80 in the winter.  (Ex. 1 at 9:14-46).  Defendant said he was familiar with Interstate 80 because it runs through Wyoming.  (Ex. 1 at 9:46-53).  Sgt. Mayo commented on the warm weather coming in from the Rocky Mountains, and Defendant stated he was traveling home before bad weather came in from the Sierra mountains, and before it got snowy on Interstate 80.  (Ex. 1 at 9:53-10:12).

Sgt. Mayo asked Defendant how long he had been married.  Defendant replied that he had been married for eleven years and had four kids that were all now adults.  (Ex. 1 at 10:30-11:07).  Sgt. Mayo asked if Defendant's pickup was a 2014, and Defendant talked to Sgt. Mayo about Dodge's lifetime warranties and the good deal he got on his pickup.  (Ex. 1 at 11:11-

---

[2] However, Defendant had a Wyoming driver's license and the pickup, properly registered to Defendant, bore Wyoming license plates.

3

12:31).  Sgt. Mayo asked Defendant if his license was "good," and Defendant indicated it was.  (Ex. 1 at 12:45-57).  Sgt. Mayo asked Defendant if he visited anyone he knew on his trip, and Defendant replied no, he was just taking photos.  (Ex. 1 at 12:59-13:08).

At this point, a second officer, Officer John Hudec, arrived at the scene to assist Sgt. Mayo by checking the VIN of Defendant's vehicle.  (TR. 22; Ex. 1 at 13:08).  Officer Hudec asked Defendant if he could open the pickup's door to check the VIN, and Defendant replied, "No, it's ok."  (Ex. 1 at 13:46-53).  Defendant agreed to let Officer Hudec check the VIN by stepping on his front tire.  (Ex. 1 at 13:54-56).  As Officer Hudec went to check the VIN, Defendant said, "This is weird for me" because he never had to sit in a police car before.  (Ex. 1 at 13:56-14:06).  Defendant asked Sgt. Mayo if he could "give me my warning" because he would "like to be on my way."  (Ex. 1 at 14:29-30).  Sgt. Mayo replied he was not done giving Defendant his warning.  (Ex. 1 at 14:31-37).  Defendant said he felt like he was "being detained."  (Ex. 1 at 14:37-40).  Sgt. Mayo testified that the "only people that know those words are lawyers, cops, and people involved in criminal activity, and he already told me that he wasn't a lawyer or a cop."  (TR. 22-23).  Defendant stated that he "know[s] what my rights are" and would "just sign it [the warning] right now."  (Ex. 1 at 14:45-54).  Sgt. Mayo replied that Defendant does not sign the warning, he still had to "run [Defendant's] name," and asked Defendant if he had ever been arrested before or if he had any criminal history.  (Ex. 1 at 14:54-59).  Defendant replied "Nope" to both questions.  (Ex. 1 at 15:00-02).  Sgt. Mayo told Defendant he was going to run his criminal history, which Defendant indicated he thought Sgt. Mayo already had done; Sgt. Mayo replied that he had only run Defendant's driver's license.  (Ex. 1 at 15:02-16).

Officer Hudec returned to the police cruiser and stated, "VIN number is all good."  (Ex. 1 at 15:16-18).  Sgt. Mayo testified that he told Officer Hudec to call the canine officer, Deputy Henkel, "as [Sgt. Mayo] walked back to speak with [Officer Hudec] briefly about the VIN number check that he had done in that time."  (TR. 48).  After learning the pickup's VIN was "good," Sgt. Mayo told Defendant to "hang on" and "we'll finish this up."  (Ex. 1 at 15:17-20).

After another minute of discussion with Defendant, Sgt. Mayo initiated a call to dispatch to run the EPIC check and III.  (Ex. 1 at 16:11-12).  Defendant asked if Sgt. Mayo had any water because his chewing tobacco was giving him cottonmouth; Sgt. Mayo replied no, but told Defendant he could get some out of his pickup if he had any.  (Ex. 1 at 16:12-30).  Sgt. Mayo

4

testified to his belief that this was unusual because chew produces saliva. (TR. 23). Sgt. Mayo told Defendant he could sit in his pickup, but Defendant declined. (Ex. 1 at 16:31-35). Sgt. Mayo provided Defendant's information to dispatch after this water discussion. (Ex. 1 at 16:45-17:32).

After Sgt. Mayo called dispatch, he began talking to Defendant again about the warning and following too closely. (Ex. 1 at 17:35-19:08). Sgt. Mayo and Defendant discussed chewing tobacco, living in Wyoming, and riding "side-by-sides." (Ex. 1 at 19:10-22:55). Defendant commented that he had driven through Nebraska's panhandle before and liked taking that route because it is more picturesque, had less traffic, and he liked the small towns. (Ex. 1 at 22:56-23:13).[3] Sgt. Mayo talking about growing up in a small town in western Nebraska and said he would like to live there if it was not so hard economically. (Ex. 1 at 23:13-24:00). Defendant agreed, and told Sgt. Mayo he is able to fly for $90 from Salt Lake City, Utah, to Los Angeles to do his surveys for his job, then come home to Wyoming to do the rest of his work. (Ex. 1 at 24:01-18). Sgt. Mayo testified to his belief that Defendant's work arrangement did not seem "cost effective" or to "make sense." (TR. 31-32).

After more discussion about preferring small town living, Sgt. Mayo apologized to Defendant because dispatch should be calling him back. (Ex. 1 at 24:52-25:05). Defendant said he was trying to make it to Sydney, Nebraska to go to the Cabela's. (Ex. 1 at 25:06-22). Defendant was familiar with some of the sporting goods stores mentioned by Sgt. Mayo and with Kearney, Nebraska. (Ex. 1 at 25:24-51). Sgt. Mayo believed this was odd because nothing in his conversation indicated that Defendant had a reason to travel on Interstate 80 east of Wyoming on a regular basis. (TR. 31). Defendant said he wished Cabela's had a better selection of sleeping bags because he had been sleeping in the back of his pickup. (Ex. 1 at 25:54-26:06).

At this point, Sgt. Mayo got out of the cruiser to speak to Officer Hudec. (Ex. 1 at 26:44-45). Sgt. Mayo stated he had "called Julie for a III" and asked Officer Hudec if he had called Deputy Henkel to bring the canine. (Ex. 1 at 26:50-54). Officer Hudec confirmed that Deputy Henkel was on his way, and asked Sgt. Mayo if Defendant was detained. (Ex. 1 at 26:52-56). Sgt. Mayo replied "no, not yet," but said Defendant said he "felt like he was being detained already." (Ex. 1 at 26:56-27:02). Sgt. Mayo told Officer Hudec about Defendant's picture tour,

---

[3] Although Sgt. Mayo testified that Defendant said he was familiar with "Highway 2" and traveled Highway 2 "multiple times," careful review of Exhibit 1 reflects that "Highway 2" is not mentioned at any point during Defendant and Sgt. Mayo's discussion. (TR. 31).

5

and Officer Hudec told Sgt. Mayo that there were "bugs on his [Defendant's] car." (Ex. 1 at 27:05-16). Sgt. Mayo testified to his belief that Defendant was not honest about his travel plans because the areas Defendant said he traveled through would be too cold to have bugs in February, so he thought that Defendant had "actually traveled further south towards a more coastal gulf region consistent with the deep south and Florida." (TR. 29).

Sgt. Mayo got back into his cruiser and asked Defendant if he wanted a Monster energy drink, and Defendant declined and indicated caffeine has a negative effect on him and it is a bad addiction to have. (Ex. 1 at 27:33-50). Sgt. Mayo believed this was odd because he noticed a box of 5-hour energy drinks in Defendant's car. (TR. 23). Defendant and Sgt. Mayo began talking about chewing tobacco and a recall of a specific brand they enjoyed, smoking, and wife nagging. (Ex. 1 at 27:49-30:16). During a lull in the conversation, Defendant asked if he gets to go home now. (Ex. 1 at 30:26-32). Sgt. Mayo said he was going to call dispatch back and stated "they didn't forget" because he "got ahold of the right person." (Ex. 1 at 30:34-45).

Sgt. Mayo called dispatch and asked if they "got anything back yet," at which point he was informed of the results of both the NCIC and EPIC checks. (Ex. 1 at 30:46-31:26; TR. 83). Sgt. Mayo testified there was nothing significant about Defendant's criminal history, but the EPIC check disclosed that a vehicle registered to Defendant at the same address where Defendant's pickup was registered had been stopped by the Nebraska State Patrol in July 2016, with almost 200 pounds of marijuana in it. (TR. 24-25). Sgt. Mayo testified that although he believed Defendant was involved in criminal activity prior to receiving this information, he nevertheless may have let Defendant go "down the road" before receiving that information, which was the "final piece of the puzzle" and set up a "red flag." (TR. 80, 84-85).

After Sgt. Mayo received the NCIC and EPIC information, he joked to Defendant that he received "bad news about your license" and said Defendant had been convicted of 40 DUIs without his knowledge. (Ex. 1 at 31:27-40). Sgt. Mayo asked Defendant if he could ask a few more questions, and Defendant agreed. (Ex. 1 at 31:40-42; TR. 25). Defendant denied having "grenade launchers," narcotics, or large amounts of U.S. currency, and agreed to show Sgt. Mayo the rear topper area of the pickup. (Ex. 1 at 31:42-33:07; TR. 25). When Sgt. Mayo looked in the rear topper area, he did not see any bedding or mattress consistent with someone who is staying in their pickup, although Defendant had previously mentioned he was saving money by sleeping in the back of his pickup. (TR. 25-26).

When Sgt. Mayo asked Defendant for his consent to search the rest of the pickup, Defendant declined and stated he would rather go. (Ex: 1 at 33:07-12; TR. 27). Sgt. Mayo then asked Defendant if he would consent to a police canine running around the exterior of his vehicle, and Defendant again expressed his desire to continue his trip. (Ex. 1 at 33:13-26; TR. 27). At that point, Sgt. Mayo told Defendant he was being detained because Sgt. Mayo suspected Defendant was transporting a large amount of currency, and he needed to wait for the canine to arrive. (Ex. 1 at 33:27-47; TR. 27).

The canine arrived approximately four minutes later, (Ex. 1 at 37:15), and alerted or indicated to the vehicle. (TR. 29). A subsequent search of the vehicle revealed a user amount of cocaine and approximately $1,200 in cash in the pickup's center console. The pickup's spare tire contained approximately seventy heat-sealed, vacuum-sealed packages of bundled U.S. currency of approximately $362,000. (TR. 29). The items were seized and Defendant was arrested.

Defendant filed the instant Motion to Suppress the evidence seized during the search, challenging the initial stop of his vehicle and the lawfulness of his detention.[4] (Filing No. 34).

## ANALYSIS

### A. Initial Stop of the Vehicle

Defendant argues that Sgt. Mayo's stop of Defendant's vehicle on the basis of following too closely was a pretext to investigate whether Defendant was transporting narcotics or other contraband. (Filing No. 16 at p. 1). However, "[I]f police observe a traffic violation, no matter how minor, there is probable cause to stop the vehicle." *United States v. Fuehrer*, 844 F.3d 767, 772 (8th Cir. 2016), *cert. denied*, 137 S. Ct. 2107 (2017) (citing *United States v. Mendoza*, 677 F.3d 822, 827 (8th Cir. 2012) and *United States v. Eldridge*, 984 F.2d 943, 947 (8th Cir. 1993)). "This is true even if a valid traffic stop is a pretext for other investigation." *United States v. Sallis*, 507 F.3d 646, 649 (8th Cir. 2007) (internal quotations omitted). "Once an officer has probable cause, the stop is objectively reasonable and any ulterior motivation on the officer's part is irrelevant." *Fuehrer*, 844 F.3d at 772 (quoting *United States v. Frasher*, 632 F.3d 450, 453 (8th Cir. 2011)).

---

[4] Defendant does not contest the lawfulness of the search on probable cause grounds and instead relies upon his assertion that the items seized are fruit of the unlawful detention.

Nebraska law provides that a driver "shall not follow another vehicle more closely than is reasonable and prudent[.]" Neb. Rev. Stat. § 60-6,140(1). Sgt. Mayo has four and a half years of experience in traffic enforcement on Interstate 80, and testified that when he first observed Defendant's pickup, it appeared to be following another vehicle at a distance closer than was reasonably prudent. Using a digital stopwatch, Sgt. Mayo determined that Defendant was following another vehicle at a timed distance of 0.51 seconds, while traveling sixty-five to seventy miles per hour. Sgt. Mayo testified that three seconds is the national standard, and that 0.51 seconds is not a reasonably prudent distance because there is no reaction time for a driver to react to the driver in front, especially traveling at interstate speed. (TR. 15). Under the facts presented, Sgt. Mayo had probable cause to believe Defendant had violated Nebraska law by following another vehicle too closely. See, e.g., *United States v. Lopez*, 564 F.3d 1001, 1003 (8th Cir. 2009) (determining that a "two-second rule . . . is an appropriate measurement of whether a trailing car is maintaining a reasonable and prudent distance."). Therefore, the Sgt. Mayo had probable cause to stop Defendant's vehicle.

### B. Detention

Defendant next challenges the lawfulness of his detention subsequent to the traffic stop. "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'--to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015)(citations omitted). "After a law enforcement officer initiates a traffic stop, the officer 'may detain the offending motorist while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation.'" *United States v. Englehart*, 811 F.3d 1034, 1040 (8th Cir. 2016) (quoting *United States v. Quintero-Felix*, 714 F.3d 563, 567 (8th Cir. 2013). These tasks may involve "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 135 S. Ct. at 1615. "An officer also may request that the driver sit in the patrol car to answer questions and may ask questions about his itinerary." *Englehart*, 811 F.3d at 1040 (quoting *Quintero-Felix*, 714 F.3d at 567). "These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Rodriguez*, 135 S. Ct. at 1615.

In this case, Sgt. Mayo initiated a valid traffic stop of Defendant's vehicle to issue a warning for the traffic violation of following too closely. Sgt. Mayo was therefore permitted to ask Defendant to sit in Sgt. Mayo's police cruiser and detain Defendant while Sgt. Mayo completed the routine tasks associated with the "mission" of issuing a warning for that traffic violation and to attend to safety concerns, including checking Defendant's driver's license, checking Defendant's registration and proof of insurance, and determining whether Defendant had outstanding warrants. See *Rodriguez*, 135 S. Ct. at 1615.

However, "A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005); see also, *Rodriguez*, 135 S. Ct. at 1612 ("[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures."). "Authority for the seizure thus ends when tasks tied to the traffic infraction are--*or reasonably should have been*--completed." *Rodriguez*, 135 S. Ct. at 1614 (emphasis added) (citing *United States v. Sharpe*, 470 U.S. 675, 685 (1985)). After this point, further detention is unreasonable, "'unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify further detention[.]'" *Fuehrer*, 844 F.3d at 772-73 (quoting *United States v. Ovando-Garzo*, 752 F.3d 1161, 1163-64 (8th Cir. 2014)).

The question before the Court is whether Sgt. Mayo had reasonable suspicion to continue to detain Defendant at the time the tasks tied to the traffic infraction *reasonably should have been completed*. See *Rodriguez*, 135 S. Ct. at 1614. "Timing is everything" in many things, but it is "especially important" when defining the contours of various, legally relevant time frames during a traffic stop and subsequent detention. See *Englehart*, 811 F.3d at 1041. "The reasonableness of a seizure . . . depends on what the police in fact do." *Rodriguez*, 135 S. Ct. at 1616 (citing *Knowles v. Iowa*, 525 U.S. 113, 115-17 (1998)). "[A]n officer always has to be reasonably diligent," which is "gauged . . . by noting what the officer actually did and how he did it[.]" *Id.* "If an officer can complete traffic-based inquiries expeditiously, then that is the amount of 'time reasonably required to complete [the stop's] mission.'" *Id.* (quoting *Caballes*, 543 U.S., at 407. "[A] traffic stop 'prolonged beyond' that point is 'unlawful.'" *Ibid.*

When determining the reasonableness of the duration of a stop, "it [is] appropriate to examine whether the police diligently pursued a means of investigation[.]" *Sharpe*, 470 U.S. at

9

686; see also *United States v. Beck*, 140 F.3d 1129, 1134 (8th Cir. 1998)("[I]n determining whether a detention following a lawful stop of a vehicle is reasonable, . . . a court must consider both the length of the detention and law enforcement officers' efforts to conduct their investigation in a quick and unintrusive manner."). "Whether a particular detention is reasonable is a fact-intensive question, measured in objective terms by examining the totality of the circumstances." *Englehart*, 811 F.3d at 1040-41 (citing *Quintero-Felix*, 714 F.3d at 567).

The video recording from Sgt. Mayo's cruiser, received into evidence as Exhibit 1, provides the Court with a clear picture of the timing and circumstances of the traffic stop. Within three minutes and forty seconds of the initial stop, Defendant had provided Sgt. Mayo with his driver's license and vehicle registration and was sitting in Sgt. Mayo's police cruiser. (Ex. 1 at 2:17-5:57). At the time he pulled Defendant over, Sgt. Mayo already determined Defendant would receive a warning for the traffic infraction of following too closely, and informed Defendant of that fact. (TR. 16). Sgt. Mayo ran Defendant's driver's license through his cruiser's mobile data terminal at the outset of the stop; Sgt. Mayo did not testify to any irregularities with Defendant's driver's license. (TR. 18-19; Ex. 1 at 5:57-6:10). According to Sgt. Mayo, his procedure when conducting a traffic stop includes calling dispatch to run a person's criminal history and to check for "wants and warrants," while simultaneously writing the traffic citation. (TR. 19, 81). Yet, in this case, Sgt. Mayo waited ten minutes and fourteen seconds after he started writing his warning to first make that phone call. (Ex. 1 at 16:11-12). Nothing unusual occurred during those ten minutes warranting Sgt. Mayo's delay.

In those ten minutes and fourteen seconds it took for Sgt. Mayo to first initiate his call to dispatch for Defendant's criminal history, Sgt. Mayo engaged Defendant in conversation about Defendant's travel plans, residence, family life, and employment; summoned Officer Hudec to check Defendant's VIN; and asked Officer Hudec to call the canine officer after Officer Hudec completed his VIN check. It was not until after Sgt. Mayo ran Defendant's driver's license, after the drug canine was en route, after Officer Hudec stated Defendant's VIN was "good," and after Defendant expressed his desire to be on his way and his feeling that he was being "detained," that Sgt. Mayo finally called dispatch to request Defendant's criminal history--a call he could have made, and usually does make, as soon as he began writing his warning citation. (Ex. 1 at 16:11-12).

The call to dispatch was the last of Sgt. Mayo's tasks associated with the acceptable "mission" of issuing a warning for the traffic violation and to attend to safety concerns. Sgt. Mayo waited another fourteen minutes and thirty-five seconds to call dispatch back to find out the results of Defendant's criminal history, during which Sgt. Mayo engaged Defendant in further questioning. It was not until Defendant asked, again, if he gets to go home, that Sgt. Mayo called dispatch back to get the results of the criminal history check. (Ex. 1 at 30:46-47). Importantly, the drug canine summoned earlier still had not arrived.

Sgt. Mayo was not "reasonably diligent" in completing his "traffic-based inquiries expeditiously." *Rodriguez*, 135 S. Ct. at 1616 (quoting *Caballes*, 543 U.S., at 407). Sgt. Mayo's own testimony reflects that he could have, and typically does, call dispatch to run a criminal history check at the outset of the stop. In this case, once Sgt. Mayo finally made that call, it took fourteen minutes and thirty-five seconds for him to call back to receive those results. Therefore, under the circumstances of this case, Sgt. Mayo reasonably should have been completed with the mission of the traffic stop approximately twenty-one minutes after his cruiser's audio/visual system began recording (as Sgt. Mayo began writing Defendant's warning at approximately the 6:00 time-stamp, and it took fourteen minutes and thirty-five seconds to receive Defendant's criminal history results once he called dispatch).[5]

At the twenty-one minute mark of the video recording, (the point in time Sgt. Mayo reasonably should have completed the tasks tied to the traffic infraction), Defendant's seizure became unconstitutional, unless Sgt. Mayo had reasonable suspicion to extend the stop. See *Fuehrer*, 844 F.3d at 772-73. Reasonable suspicion exists if an officer is aware of "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant[s] suspicion that a crime [is] being committed." *Beck*, 140 F.3d at 1136 (citations omitted). The court looks to the totality of the circumstances when determining whether reasonable suspicion exists. *Id.* "In assessing whether the requisite degree of suspicion exists," courts "must determine whether the facts collectively establish reasonable suspicion, not whether each particular fact establishes reasonable suspicion." *Id.* Although "both innocent and criminal acts can create reasonable suspicion," *United States v. Juvenile TK*, 134 F.3d 899, 903 (8th Cir. 1998) (citation omitted), an officer's suspicion cannot be based on a mere "hunch" or

---

[5] This assumes that fourteen minutes and thirty-five seconds was in fact necessary for dispatch the complete the check. The undersigned magistrate judge notes that dispatch was ready with the information as soon as Sgt. Mayo finally called back.

circumstances which "describe a very large category of predominantly innocent travelers." *Beck*, 140 F.3d at 1136 (quoting *Reid v. Georgia*, 448 U.S. 438 at 440-41 (1980).

As discussed above, had Sgt. Mayo diligently pursued his traffic-based inquiries, he reasonably should have completed the tasks tied to the traffic infraction twenty-one minutes into the video recording. During this time-frame, the government points to the following items supporting Sgt. Mayo's reasonable suspicion that Defendant was engaged in criminal activity: (1) Defendant's demeanor and nervousness during the traffic stop and manner in which he responded to questions; (2) wearing an Oakland Raiders t-shirt; (3) having multiple energy drinks and loose trash in his pickup, which had a "lived-in look;" (4) taking a two-week vacation to take pictures in Tennessee and Indiana in February without his wife; and (5) observing only two backpacks for a two-week trip. (TR. 16-18, 24-25, 67-68).[6]

Taking care not to engage in a "divide-and-conquer analysis," *United States v. Arvizu*, 534 U.S. 266, 274 (2002), the Court finds that none of the above factors, individually or taken together, give rise to reasonable suspicion. Sgt. Mayo's subjective assessment that Defendant appeared nervous during the stop is afforded little weight in the reasonable suspicion analysis. "It certainly cannot be deemed unusual for a motorist to exhibit signs of nervousness when confronted by a law enforcement officer." *Beck*, 140 F.3d at 1139. Moreover, upon this Court's review of Exhibit 1, Defendant's conversation with Sgt. Mayo took place in conversational tones and Defendant did not appear to pause or hesitate when answering Sgt. Mayo's questions. Although Sgt. Mayo testified an individual's nervousness typically subsides when they learn they will only be getting a warning, Defendant told Sgt. Mayo on more than one occasion he had never sat in a police cruiser before, which would explain a nervous demeanor, his feeling that he was being detained, and his confusion as to why it was necessary for a traffic warning of following too closely.

The government also cites Sgt. Mayo's subjective disbelief that Defendant was on a two-week photo tour of Indiana and Tennessee in February without his wife. While unusual or

---

[6] As reflected by the time-stamps in Exhibit 1, Sgt. Mayo observed or learned about the remaining items arguably supporting reasonable suspicion after the tasks tied to the traffic infraction reasonably should have been completed. This includes Sgt. Mayo's learning about the bugs on the front of Defendant's pickup, Defendant's familiarity with Interstate 80 east of Wyoming, Defendant's statement that caffeine has a negative effect on him, Defendant's flights to Los Angeles from Salt Lake City for his job, and that Defendant's pickup was registered at the same address as another vehicle that had been stopped by the Nebraska State Patrol in July 2016, with almost 200 pounds of marijuana in it. (TR. 16-18, 24-25, 67-68).

suspicious travel plans may give rise to reasonable suspicion, *Beck*, 140 F.3d at 1139, Defendant's explanation for his travel plans was not inherently suspicious, particularly when combined with Sgt. Mayo's observations of Defendant's pickup. Sgt. Mayo described that Defendant's pickup had a "lived-in look" and contained loose trash and energy drinks, which supported Defendant's statements that he had been on an extended trip in his own personal vehicle. Loose trash and energy drinks in an individual's personal vehicle after a two-week road trip "describe a very large category of predominantly innocent travelers." *Beck*, 140 F.3d at 1136.

Additionally, unlike other cases where a "lived-in-look" may be significant, Defendant was not driving a rental vehicle. Defendant was driving his own vehicle (registered in Nebraska's neighboring state of Wyoming), with a Wyoming driver's license, and was traveling west towards Wyoming on Interstate 80. Sgt. Mayo testified he does not consider Wyoming a drug source or drug destination state. (TR. 58). Although Sgt. Mayo doubted Defendant's residence was actually Wyoming, but was instead the "drug source" state of California because Defendant was wearing an Oakland Raiders t-shirt, wearing a sports team t-shirt from a city other than the city you are from or currently live is so ubiquitous to the general public, motoring or otherwise, that this factor is afforded no weight.

Finally, Sgt. Mayo's initial observation of two back-packs as Defendant's luggage is not sufficient to generate any significant suspicion of criminal activity. See, e.g., *Beck*, 140 F.3d at 1139 (officer's observation of no luggage in the passenger compartment "fail[ed] to generate any suspicion of criminal activity.").

The Court finds that Sgt. Mayo was faced with circumstances that, as a whole, were insufficient to establish reasonable suspicion necessary to justify extending the traffic stop, in the time frame that the traffic infraction reasonably should have been completed. Sgt. Mayo was not reasonably diligent in completing his traffic-based inquiries expeditiously, prolonging Defendant's detention beyond the point necessary to complete the traffic citation, without reasonable, articulable suspicion that criminal activity was afoot. The "purpose of the exclusionary rule is to deter misconduct by law enforcement," *Davis v. United States*, 564 U.S. 229, 246 (2011), and a practice of delaying or being dilatory in completing a warning, without

reasonable suspicion, to circumvent the holding in *Rodriguez*, should be deterred.[7] Defendant's Fourth Amendment right to be free from unreasonable seizure was violated, and the evidence obtained in this case is tainted as a result of this unlawful detention and should be suppressed. See *Wong Sun v. United States*, 371 U.S. 471 (1963); *United States v. Yousif*, 308 F.3d 820, 829 (8th Cir. 2002). Therefore, the undersigned will recommend that Defendant's Motion to Suppress (Filing No. 16) be granted. Accordingly,

**IT IS HEREBY RECOMMENDED** to Chief Judge Laurie Smith Camp that Defendant's Motion to Suppress (Filing No. 16) be granted.

Dated this 5th day of September, 2017.

BY THE COURT:

s/ Michael D. Nelson
United States Magistrate Judge

### ADMONITION

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

---

[7] In *Rodriguez*, the Supreme Court held that "a police stop exceeding the time needed to handle the matter for which the stop was made" is an unreasonable seizure; without reasonable suspicion, an officer may not prolong a traffic stop beyond the point the officer completes the mission of issuing a ticket or warning for the traffic violation to conduct a dog sniff. *Rodriguez*, 135 S. Ct. at 1612.