# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                   Plaintiff,<br><br>vs.<br><br>MARK STEELE,<br><br>                   Defendant. | 8:17CR113<br><br>MEMORANDUM AND ORDER |

This matter is before the Court on the Findings and Recommendation (F&R), ECF No. 45, issued by Magistrate Judge Michael D. Nelson. The Magistrate Judge recommended that the Motion to Suppress filed by the Defendant Mark Steele, ECF No. 16, be granted. The Government filed Objections to the F&R, ECF No. 48, as allowed by 28 U.S.C. § 636(b)(1)(C) and NECrimR 59.2(a). Steele did not respond to the Objections. For the reasons set forth below, the F&R will be adopted in part, the Objection will be sustained, and the Motion to Suppress will be denied.

## BACKGROUND

Steele is charged with conspiracy to distribute or possess with intent to distribute marijuana and using a facility in interstate commerce to facilitate the promotion of unlawful activity. Indictment, ECF No. 12. Steele seeks to suppress any evidence gained by law enforcement on February 10, 2017, on the grounds that the detention of his vehicle and its search were conducted in violation of his right to be free from unreasonable searches and seizures under the Fourth Amendment.

At the suppression hearing, a recording of the traffic stop was received into evidence (Exhibit 1). A transcript (Tr.) of the hearing was filed on August 18, 2017.[1] ECF No. 44. The Magistrate Judge provided extensive and detailed factual findings regarding the events of the traffic stop at issue. *See* F&R at 1-7, ECF No. 45, Page ID 186-192. The Government did not object to the Magistrate Judge's factual findings. The Court incorporates those findings by reference, and provides the following summary:

On February 10, 2017, Sergeant Jason Mayo was conducting traffic enforcement on Interstate 80 in Lancaster County when he observed Steele's vehicle following too closely behind another vehicle. Mayo pulled Steele over. Mayo then approached Steele's vehicle, explained the reason for the stop, and asked Steele to come to Mayo's cruiser while Mayo performed routine tasks associated with the stop. Mayo described Steele as somewhat nervous and found it odd that Steele did not want to open his glove box or center console to look for his insurance card. Mayo also noted that Steele's vehicle had a "lived-in" look, and contained a box of 5-Hour Energy Drinks and two backpacks.

While Mayo performed routine checks on Steele's registration and license, Mayo and Steele discussed Steele's travel. Steele said he was on his way home to Evanston, Wyoming, after a photo tour in Indiana and Tennessee. Mayo asked if Steele was a professional photographer and Steele said he was not, and that he did mapping and surveying work for a city in Southern California. Mayo testified that it struck him as odd that Steele lived in Wyoming, worked in Los Angeles, and was on a photo tour of Indiana and Tennessee in February.

---

[1] Internal references to the Transcript in this Memorandum and Order omit the Page ID number.

Mayo testified that when Steele answered questions, he stopped and paused as if he was thinking about his answers, and continued this behavior throughout the encounter even after being told he would receive only a warning ticket.

Another officer, John Hudec, arrived and assisted Mayo by confirming the validity of the Steele's Vehicle Identification Number (VIN). As Hudec checked the VIN, Steele told Mayo that Steele felt as if he was being detained and would like to be on his way. Mayo told Steele he was not being detained, but that Mayo needed to finish performing tasks associated with the stop before Steele could go. After performing checks on Steele's license and registration, Mayo explained the process of checking Steele's criminal history. Steele said he thought Mayo had run the criminal history check, but Mayo said he had only checked Steele's driver's license. (Ex. 1 at 15:02-16).

After another minute of conversation with Steele, approximately 10 minutes and 14 seconds into the stop, Mayo initiated a call to dispatch to run checks on Steele's criminal history.[2] Steele asked if Mayo had any water because his chewing tobacco was making his mouth dry. Mayo replied no, but told Steele he could get water from his pickup truck if he had any. After several more minutes of discussion, Mayo apologized to Steele because dispatch had not called back regarding Steele's criminal history. Steele said he was trying to make it to Sydney, Nebraska, to go to a Cabela's store, and he wished Cabela's had a better selection of sleeping bags because he had been sleeping in the back of his pickup truck.

---

[2] Mayo testified that he ran two types of criminal background checks: the first is known as a "III" and the second is from the El Paso Intelligence Center (EPIC). Mayo testified that he runs one or both of these checks during the course of each traffic stop that he makes. (Tr. 19).

After this conversation, Mayo exited the cruiser to speak to Hudec. Mayo told Hudec that he "called Julie for a [check on Steele's criminal history]" and asked Hudec if he called Deputy Henkel to bring a canine. (Ex. 1 at 26:50-54). Hudec confirmed that Deputy Henkel was on his way, and asked Mayo if Steele was detained. (Ex. 1 at 26:52-56). Mayo replied "no, not yet," but that Steele said he "felt like he was being detained already." (Ex. 1 at 26:56-27:02). Mayo told Hudec about Steele's picture tour and Hudec told Mayo that there were "bugs on his [Steele's] car" indicating Steele may have been in climates warmer than Indiana. (Ex. 1 at 27:05-16). At the hearing, Mayo testified that he requested a canine because he was going to ask Steele for consent to a dog sniff.

Mayo returned to the cruiser and asked Steele if he wanted a Monster energy drink. Steele refused and said caffeine had a negative effect on him and was a bad addiction. Mayo thought Steele's statement was odd in light of the box of 5-hour energy drinks in Steele's car. Mayo again apologized for the delay and said he was going to call dispatch again. Approximately 24 minutes and 45 seconds into the stop, and 14 minutes and 35 seconds after initiating the call to dispatch for the criminal history checks, Mayo called dispatch and was informed that a vehicle registered to Steele at the same address where Steele's pickup truck was registered had been stopped by the Nebraska State Patrol in July 2016, with almost 200 pounds of marijuana. Mayo testified that although he suspected Steele was involved in criminal activity before he received this information, he nevertheless might have let Steele go "down the road," but the information from dispatch was the "final piece of the puzzle" and set up a "red flag." (Tr. 80, 84-85).

4

After Mayo received the results of the criminal history checks, Mayo delivered the warning and asked Steele if he could ask a few more questions. Steele denied having "grenade launchers," narcotics, or large amounts of U.S. currency in the pickup truck, and agreed to show Mayo the rear topper area of the vehicle. (Tr. 25). Mayo looked in the rear topper area and did not see any bedding. Mayo testified that this was inconsistent with someone sleeping in a vehicle. Mayo asked Steele for his consent to search the rest of the pickup. Steele stated he would rather continue his trip. Mayo then asked Steele if he would consent to a police canine running around the exterior of the vehicle, and Steele again stated he would rather go. Approximately 28 minutes into the stop, Mayo advised Steele that he was being detained because Mayo suspected Steele was transporting a large amount of currency and he would need to wait for the canine to arrive.

The canine arrived roughly four minutes later and alerted or indicated to the vehicle. Officers searched the vehicle and found a user amount of cocaine and $1,200 cash in the center console. In the vehicle's spare tire, officers found approximately seventy heat-sealed, vacuum-sealed packages of bundled U.S. currency totaling approximately $362,000.

## STANDARD OF REVIEW

Under 28 U.S.C. § 636(b)(1)(C) and NECrimR 59.2(a), the Court shall make a *de novo* review of the portions of the Magistrate's Findings and Recommendation to which objections have been made. The Court may accept, reject, or modify, in whole or in part, the Magistrate Judge's findings and recommendations. The Court may also receive further evidence or remand the matter to the Magistrate Judge with instructions.

5

**DISCUSSION**

The Fourth Amendment guarantees that people should be "secure in their persons, houses, papers, and effects against unreasonable searches and seizures, and no Warrants shall issue, but upon probable cause . . ." U.S. Const., amend. IV. Steele argues that the search of his pickup truck, and the seizure of evidence from the truck, were unreasonable because Mayo unnecessarily prolonged the traffic stop.

The Magistrate Judge concluded that Mayo was justified in stopping Steele for following too closely, but that the stop was unnecessarily prolonged because Mayo did not act expeditiously when requesting and receiving Steele's criminal history. The Magistrate Judge therefore concluded that Mayo did not have a reasonable suspicion to search Steele's vehicle, because the facts supporting such a suspicion must be limited to Mayo's observations while the duration of the stop was reasonable.

After a careful review of Exhibit 1 and the record as a whole, the Court agrees that Mayo's stop of Steele's vehicle was justified, but the Court concludes that the delay in Mayo's receipt of Steele's criminal history was not unreasonable or intentional.

**I. Completing the Stop With Reasonable Diligence**

The reasonableness of the length of a traffic stop and a resulting detention are fact-based questions, and a traffic stop is not subject to a defined limit. *United States v. Riley,* 684 F.3d 758, 765 (8th Cir. 2012). "After a law enforcement officer initiates a traffic stop, the officer 'may detain the offending motorist while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation.'" *United States v. Englehart*, 811 F.3d 1034, 1040 (8th Cir. 2016) (quoting *United States v. Quintero-Felix,* 714 F.3d 563, 567 (8th Cir. 2013). These tasks may involve "checking

6

the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015). "If an officer can complete traffic-based inquiries expeditiously, then that is the amount of 'time reasonably required to complete [the stop's] mission.'" *Rodriguez v. U.S.*, 135 S. Ct. 1609, 1616 (2015) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). "[A] traffic stop 'prolonged beyond' that point is 'unlawful.'" *Id.* (quoting *Caballes*, 543 U.S. at 407).

Once an officer initiates a stop, "it should last no longer than is necessary to dispel the officer's suspicions." *United States v. Long*, 532 F.3d 791, 795 (8th Cir. 2008) (citing *United States v. Jones*, 269 F.3d 919, 924 (8th Cir. 2001)). "[A] reasonable investigation of a traffic stop may include . . . requesting the driver to sit in the patrol car, and asking the driver about his destination and purpose" of the trip. *United States v. Ramos*, 42 F.3d 1160, 1163 (8th Cir. 1994) (citing *United States v. Barahona*, 990 F.2d 412, 416 (8th Cir. 1993). "[O]nce an officer finishes the tasks involved with the traffic violation the purpose of the traffic stop is complete and further detention of the driver or vehicle would be unreasonable, unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify further detention or unless the continued encounter is consensual." *Englehart*, 811 F.3d at 1041 (internal quotations omitted). An officer may ask for consent to search after the purpose of a stop has concluded without violating the Fourth Amendment. *Long*, 532 F.3d 791 at 795.

The Magistrate Judge noted that Mayo waited 10 minutes into the stop before he initiated the request for Steele's criminal history, and another 14 minutes before calling back to inquire about the results. The Magistrate Judge said the criminal history call was

7

one Mayo "could have made, and usually does make, as soon as he began writing his warning citation." F&R at 10, ECF No. 45, Page ID 195. Thus, to determine whether Mayo had reasonable suspicion of criminal activity, justifying the wait for a canine, the Magistrate Judge considered only events that occurred before the 21:00 mark of Exhibit 1, approximately 17 minutes from the initiation of the stop.

Mayo did not expressly state that he routinely initiates criminal history checks as soon as he begins to write warnings. Instead, he testified that he begins a stop by running the registration and driver's license inquiries, which take at least 10 minutes. Once he has verified a driver's identity, he begins to fill out a warning. (Tr. 18-19). Mayo testified that "during the course of the stop as [he is] filling out the warning" he will run the criminal history. (*Id.*). Exhibit 1 demonstrates that as soon as Mayo verified Steele's license and registration, and while Hudec verified the VIN, Mayo told Steele he would run his criminal history. This is consistent with Steele's testimony that Mayo ran the criminal history checks while he filled out the warning and after he verified Steele's license and registration.

The Supreme Court has warned that "[m]uch as a 'bright line' rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria." *United States v. Sharpe*, 470 U.S. 675, 685 (1985). "The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it." *Id.* at 687. During the first 10 minutes of the stop, Mayo can be heard actively verifying Steele's driver license and registration information through the cruiser's computer terminal. After requesting Steele's criminal history, Mayo

apologized to Steele several times for the delay, which was not caused by Mayo. During that delay Mayo did not ask any Steele any questions aimed at eliciting incriminating responses.[3] After Mayo received the results of the criminal history checks and delivered the warning, then he asked specific questions about the contents of Steele's vehicle. The Court concludes that Mayo was not "dilatory in [his] investigation," *Sharpe*, 470 U.S. at 687, and the wait for the results of the criminal background check was not a police tactic designed to obtain incriminating information.[4]

## II. But-For Cause of Obtaining Reasonable Suspicion

The "routine but somewhat time-consuming tasks related to a traffic violation" may "include running a similar check of the occupants' identification documents and criminal histories." *United States v. Murillo-Salgado*, 854 F.3d 407, 415 (8th Cir. 2017), *cert. denied,* No. 17-5303, 2017 WL 3184610 (U.S. Oct. 2, 2017). "A 'warrant check makes it possible to determine whether the apparent traffic violator is wanted for one or more previous traffic offenses.'" *Rodriguez*, 135 S. Ct. at 1615 (quoting LaFave, Search and Seizure § 9.3(c), p. 516 (5th ed. 2012)). Steele does not dispute that it was proper for Mayo to run a criminal history check, and that Mayo eventually did so.

In *United States v. Peralez,* a law enforcement officer prolonged a traffic stop, without reasonable suspicion, for 10 minutes after he told the suspects that they would only receive a warning ticket for a traffic violation. 526 F.3d 1115, 1118 (8th Cir. 2008).

---

[3] A review of the video shows that, without any specific prompting, Steele volunteered information regarding his familiarity with Nebraska roads, his trips to Southern California, and his dislike of caffeine.

[4] At the hearing, counsel for Steele implied that Mayo attempted to prolong the stop to ensure the arrival of the canine. Although, at the hearing, Mayo speculated that the canine officer may have been at home and had to put on his uniform before departing, the evidence does not show that Mayo had any such information at the time of the stop or purposely delayed the stop. Mayo can be heard reiterating to Hudec his frustration at the time it was taking to hear back on the criminal background check.

During the 10-minute extension, the officer engaged the suspects in a series of questions related to drug interdiction, unrelated to the basis of the stop. *Id.* at 1121. Because of this questioning, the Eighth Circuit held that "the trooper's focus on non-routine questions prolonged the stop 'beyond the time reasonably required' to complete its purpose." *Id.* at 1121 (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). Nevertheless, the Eighth Circuit did not require suppression in *Peralez* because the officer had announced his intention to search the vehicle before questioning the suspects, and he had the canine with him at the scene. *Id.* at 1121-22. Thus, the unconstitutionally prolonged detention was not "'a but-for cause of obtaining the evidence'" *Id.* at 1121 (quoting *United States v. Olivera-Mendez*, 484 F.3d 505, 511 (8th Cir. 2007)).

Here, even if Mayo's delay in calling for Steele's criminal background unnecessarily prolonged the stop, that delay was not the but-for cause of Mayo's reasonable suspicion of criminal activity. The criminal history check revealed that a vehicle registered to Steele at Steele's current address had been stopped by the Nebraska Highway Patrol less than a year before, and that vehicle contained nearly 200 pounds of marijuana. Even if Mayo had requested the criminal history check at the beginning of the stop, and even if the criminal history had been provided by the dispatch office sooner, the information would have been the same. Thus, any delay in seeking and obtaining Steele's criminal history was not the but-for cause of obtaining information leading to the reasonable suspicion that formed the basis for the search.

### III. Reasonable Suspicion to Wait For the Canine

Under the Fourth Amendment, "an officer conducting a traffic stop who discovers information leading to reasonable suspicion of an unrelated crime may extend the stop and broaden the investigation." *United States v. Woods*, 829 F.3d 675, 679 (8th Cir. 2016). Absent reasonable suspicion, however, an officer may not broaden the investigation "'beyond the time reasonably required to complete the mission' of issuing a warning ticket." *Rodriguez*, 135 S. Ct. at 1615 (quoting *Caballes*, 543 U.S. at 407). "An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* "A dog sniff . . . is a measure aimed at detecting evidence of ordinary criminal wrongdoing." *Id.* (citations and quotations omitted). Accordingly, detention "beyond completion of the traffic infraction investigation" must be supported by "reasonable suspicion of criminal activity." *Id.* at 1616-17.

Reasonable suspicion requires more than an "inchoate and unparticularized suspicion or 'hunch.'" *United States v. Smith*, 789 F.3d 923, 928 (8th Cir. 2015) (quoting *United States v. Garcia*, 23 F.3d 1331, 1334 (8th Cir. 1994)). "While 'reasonable suspicion' must be more than an inchoate 'hunch,' the Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory stop." *United States v. Lyons*, 486 F.3d 367, 371 (8th Cir. 2007). Law enforcement officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Smith*, 789 F.3d at 928 (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). As a result, "due weight must be

given 'to the factual inferences drawn by the law enforcement officer.'" *United States v. Donnelly*, 475 F.3d 946, 952 (8th Cir. 2007) (quoting *Arvizu*, 534 U.S. at 277).

In order to establish reasonable suspicion, "'the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant' further investigation." *Woods*, 829 F.3d at 679 (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). Although some factors may appear innocent when considered alone, "a combination of factors may give rise to reasonable suspicion." *United States v. Briasco*, 640 F.3d 857, 860 (8th Cir. 2011). "Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances." *United States v. Beck*, 140 F.3d 1129, 1137 (8th Cir. 1998) (quoting *United States v. Halls*, 40 F.3d 275, 276 (8th Cir. 1994)). "However, in order to measure the totality of the circumstances, it is necessary to first break the reasonable suspicion into separate observations." *United States v. Johnson*, No. 8:16CR241, 2017 WL 933044, at *5 (D. Neb. Mar. 9, 2017) (quoting *Beck*, 140 F.3d at 1137-39 (analyzing each observation separately before combining them in a totality of the circumstances test)).

    **a. Immediate Observations Justifying Reasonable Suspicion**

In this case, the Magistrate Judge identified five observations that arguably contributed to Mayo's reasonable suspicion:

> (1) Defendant's demeanor and nervousness during the traffic stop and manner in which he responded to questions; (2) wearing an Oakland Raiders t-shirt; (3) having multiple energy drinks and loose trash in his pickup, which had a "lived-in look;" (4) taking a two-week vacation to take

pictures in Tennessee and Indiana in February without his wife; and (5) observing only two backpacks for a two-week trip.

ECF No. 45, Page ID 197 (TR. 16-18, 24-25, 67-68). Each of these observations occurred within the window of time the Magistrate concluded was reasonable for the stop. The Court agrees with the Magistrate Judge that wearing an Oakland Raiders t-shirt is not activity that would support a suspicion of criminal activity; nor were the appearance multiple energy drinks or the "lived-in" look of the truck. However, Mayo's other observations occurring soon after he stopped Steele, under the totality of the circumstances, supported a reasonable suspicion of criminal activity. These observations included Steele's nervous behavior and unusual travel plans.

The Eighth Circuit has held that a "suspect's nervous demeanor alone was not enough to establish reasonable suspicion." *United States v. Riley*, 684 F.3d 758, 763 (8th Cir. 2012). However, when coupled with other observations, nervousness can lead to reasonable suspicion. *See id.* In evaluating whether certain behavior is suspicious, the Court "may consider any added meaning certain conduct might suggest to experienced officers trained in the arts of observation and crime detection and acquainted with operating modes of criminals." *Beck*, 140 F.3d at 1136; see also *United States v. Cobo-Cobo*, 873 F.3d 613, 617 (8th Cir. 2017) ("We consider all the relevant circumstances, keeping in mind that officers may draw on their experience and training to make inferences from the information they have.")

Mayo is an experienced narcotics officer. He has been employed by the Lancaster County Sheriff's Office and with the Lincoln/Lancaster County Narcotics Task Force from 2009 to 2012. (Tr. 9). He has over 350 hours of specific interdiction training,

13

and has taught traffic stop interdiction. (Tr. 10). In the six months prior to the evidentiary hearing, Mayo conducted 600-700 traffic stops. (Tr. 40). He testified that, based on his experience and training, Steele's mannerisms in answering questions—stopping and pausing as if to think of his answers and stopping to scratch his head—were consistent with people involved in criminal activity. (Tr. 21). A review of Exhibit 1 shows that while Steele's tone was generally conversational, he paused when answering questions about how long he lived in Wyoming (Ex. 1, 6:15); where he used to live (6:23); what "keeps him busy" (7:15); and what he does for work (7:50). The Court must view these observations "in light of a law enforcement officer's experience and familiarity with the practices of narcotics couriers." *United States v. Condelee*, 915 F.2d 1206, 1209 (8th Cir. 1990).

Steele's travel plans also contributed to Mayo's suspicion of criminal activity. "[U]nusual or suspicious travel plans may give rise to reasonable suspicion." *Beck*, 140 F.3d at 1139 (citing *United States v. Wood*, 106 F.3d 942, 946–47 (10th Cir. 1997) (noting that "unusual travel plans may provide an indicia of reasonable suspicion."), *United States v. Kopp,* 45 F.3d 1450, 1453 (10th Cir. 1995) (finding that suspicious travel plans, inconsistent answers, and nervousness were sufficient to constitute reasonable suspicion)). Shortly into the stop, Mayo learned that Steele lived in Wyoming, yet worked for a city government in Southern California. At the time of the stop, Steele was returning from a two week photo tour of Indiana, Tennessee, and Kentucky.[5]   Mayo testified that Steele's answers set him apart from the standard

---

[5] The Government suggests that the fact that Steele initially stated he toured Tennessee but later stated he toured Kentucky shows inconsistency in his travel plans. The Court does not give this fact much

14

motoring public. (Tr. 21). When coupled with Steele's mannerisms and nervousness, such responses "are sufficiently unusual and suspicious that they eliminate a substantial portion of innocent travelers" and contribute to reasonable suspicion. *See United States v. Carpenter*, 462 F.3d 981, 987 (8th Cir. 2006).

### b. Observations after Mayo Called for Steele's Criminal Background

The Magistrate Judge did not consider other observations that contributed to Mayo's reasonable suspicion of criminal activity, because the Magistrate Judge concluded that such observations occurred outside the reasonable time necessary to complete the stop. These observations included the bugs on the front of Steele's pickup; Steele's familiarity with Nebraska roads; Steele's statement that caffeine had a negative effect on him despite his possession of a case of 5-Hour Energy bottles; Steele's flights to Los Angeles from Salt Lake City for his job; and the fact that a vehicle registered to Steele at the same address as the pickup truck had been stopped by the Nebraska State Patrol in July 2016, and contained almost 200 pounds of marijuana. (TR. 16-18, 24-25, 67-68).

For the reasons stated above, the Court will consider the information retrieved from the criminal history report. That information, when combined with Steele's mannerisms and unusual travel plans, was sufficient to support a reasonable suspicion of criminal activity and to justify Steele's detention pending the canine's arrival. Even if the information from the criminal history checks was not considered, Mayo's other

---

weight, as Steele did not tell Mayo that he *toured* Kentucky, but that he went "through Kentucky." The Court takes judicial notice that to get to Tennessee from Indiana, one may travel through Kentucky.

observations were sufficient to support a reasonable suspicion of criminal activity, justifying the detention pending arrival of the canine.

## CONCLUSION

For the reasons discussed, the Findings and Recommendation will be adopted, in part. The Court adopts the factual findings and the finding that the initial stop was justified. However, the Court concludes that Mayo acted with reasonable diligence in completing the stop and had reasonable suspicion of criminal activity, sufficient to detain Steele briefly pending the arrival of the canine. Accordingly, the Motion to Suppress will be denied.

IT IS ORDERED:

1. The Findings and Recommendation, ECF No. 45, are adopted in part, consistent with this Memorandum and Order;

2. The Objections to the Findings and Recommendation, ECF No. 48, are sustained, consistent with this Memorandum and Order; and

3. The Motion to Suppress filed by the Defendant Mark Steele, ECF No. 16, is denied.

Dated this 20th day of November, 2017.

BY THE COURT:

s/Laurie Smith Camp
Chief United States District Judge